UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

RAYMOND MAURICE WADDELL,

        Petitioner,

v.

JESSICA SYMMES – Warden,
Oak Park Heights,

        Respondent.

Civil No. 09-417 (JNE/AJB)

**REPORT AND RECOMMENDATION**

---

    Attorney Katherine M. Menendez, Office of Federal Public Defender, 107 U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota, 55415, for Petitioner.

    Attorney Mark Nathan Lystig, Assistant Ramsey County Attorney, 50 West Kellogg Boulevard, Suite 315, St. Paul, Minnesota, 55102, for Respondent.

---

ARTHUR J. BOYLAN, Chief United States Magistrate Judge

    This matter is before the undersigned Magistrate Judge of the District Court on the petition of Raymond Maurice Waddell for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The matter has been referred to this Court for report and recommendation under 28 U.S.C. § 636 and Local Rule 72.1. For the reasons discussed below, the Court finds that Petitioner's habeas corpus petition should be DENIED, and this action should be DISMISSED WITH PREJUDICE.

## I. BACKGROUND

    In May 2001, Petitioner was convicted in the state district court for Ramsey County, Minnesota, on a charge of first degree murder. He was sentenced to life in prison, and he is currently serving his sentence at the Minnesota Correctional Facility at Oak Park Heights, Minnesota.

Petitioner challenged his conviction and sentence in a direct appeal to the Minnesota Supreme Court, but his claims were denied, and his conviction and sentence were affirmed. State v. Waddell, 655 N.W.2d 803 (Minn. 2003). According to Petitioner, "[n]o further review was sought in state or federal court until [Petitioner] filed his [current] petition for habeas corpus review pursuant to 28 U.S.C. § 2254 on February 20, 2009." ("Petitioner's Memorandum In Support Of Equitable Tolling," [Docket No. 21], p. 4.)[1]

Shortly after Petitioner filed his current habeas corpus petition, it was reviewed by this Court pursuant to Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts.[2] The Court noted that the conviction at issue became final in early 2003, and Petitioner did not file his habeas corpus petition until early 2009. It therefore appeared that the petition was barred by the one-year statute of limitations prescribed by 28 U.S.C. § 2244(d)(1). The Court further noted that Petitioner had not filed any post-conviction motions in the state courts, which could have tolled the statute of limitations pursuant to § 2244(d)(2), and Petitioner had not suggested that the statute of limitations

---

[1] Petitioner's habeas corpus petition indicates that he sought certiorari review in the United States Supreme Court after his conviction and sentence were upheld by the Minnesota Supreme Court. (Petition, [Docket No. 1], p. (3), § 9(f).) However, the Court has been unable to verify that Petitioner actually filed a petition for a writ of certiorari, and his memorandum, (cited in the text), confirms that, in fact, he never did so.

[2] Rule 4 states that:

"The clerk must promptly forward the petition to a judge under the court's assignment procedure, and the judge must promptly examine it. If it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court, the judge must dismiss the petition and direct the clerk to notify the petitioner. If the petition is not dismissed, the judge must order the respondent to file an answer, motion or other response within a fixed time or take other action the judge may order."

could have been tolled for any period of time based on the doctrine of equitable tolling. Therefore, acting pursuant to Rule 4, (see n. 2, supra), the Court recommended that this action should be summarily dismissed due to untimeliness. (See Report and Recommendation, ["R&R"], dated February 25, 2009; [Docket No. 4].)

Petitioner filed an objection to the R&R in which he contended that he "would like to proceed under the Doctrine of 'Equitable Tolling.'" (Objection to R&R, [Docket No. 7], p. 2.) Petitioner contended that the statute of limitations should because of his long history of mental illness. (Id.) The objection to the R&R was supported by an affidavit in which Petitioner stated: "Between the years 2002-2007, I Raymond Maurice Waddell has [sic] had a mental illness." (Affidavit of Raymond Maurice Waddell, [Docket No. 7-1], p. 1, ¶ 2.) Petitioner's affidavit was accompanied by about 50 pages of records, which included information pertaining to his mental health issues between 2002 and 2007. (Docket No. 7-1, pp. 3-52.)

Based on the information presented in Petitioner's objection to the R&R, the District Court Judge declined to adopt the R&R, and the matter was remanded to this Court for further proceedings. (Order dated April 10, 2009; [Docket No. 8].) After the case was remanded, this Court appointed counsel from the Office of the Federal Public Defender to represent Petitioner. (Order dated April 14, 2009; [Docket No. 9].) Thereafter, both parties pursued discovery, and jointly proposed that they should be allowed to file further briefing on the subject of equitable tolling. ("Joint Report to Court;" [Docket No. 17].) The Court accepted the parties' proposal, and they proceeded to file their additional briefs, as well as various documentary evidence. (Docket Nos. 21, 22, 24 and 26.)

At Petitioner's request, the Court conducted an evidentiary hearing in this matter on May 17, 2010. Petitioner appeared at the hearing, in person and with counsel, and he was the sole witness at the hearing. Petitioner was examined by his attorney, and cross-examined by Respondent's attorney. A transcript of the hearing is included in the present record. (Docket No. 34.) After the evidentiary hearing, each party submitted a final brief on the issue of equitable tolling. (Docket Nos. 36 and 39.) Petitioner also resubmitted his exhibits, together with a new set of written interrogatories posed to, and answered by, Tammy Lisowy, a prison therapist who knows Petitioner, and has helped treat his mental health problems during his incarceration. (Docket No. 38.[3])

The matter is now before the Court for the sole purpose of determining whether Petitioner's current habeas corpus petition is time-barred, as Respondent contends, or whether it should be accepted as timely based on equitable tolling, as Petitioner contends.

## II. EVIDENTIARY RECORD

The record currently before the Court includes the following evidence:

1. A one-page typewritten affidavit from Petitioner dated January 9, 2010, (Docket No. 7-1, p. 1), (hereafter "Pet.1[ST]Aff.").

2. A compilation of prison records and other materials that Petitioner submitted with his objections to this Court's initial R&R, (Docket No. 7-1, pp. 3-52).

3. An appendix of various medical records, prison records, and other documents filed by Petitioner on November 16, 2009, (Docket No. 22).[4]

---

[3] The interrogatories and answers that were added to Petitioner's Appendix are at pp. 234-41.

[4] This appendix was filed conventionally, rather than electronically.

4.   An appendix of various medical records, prison records, and other documents filed by Respondent on December 7, 2009, (Docket No. 24-3), (hereafter "Resp.Appx.").

5.   A transcript of the evidentiary hearing conducted on May 24, 2010, (Docket No. 34), (hereafter "Trans.").

6.   A duplicate of Petitioner's Appendix, which also includes interrogatories to, and answers from, Tammy Lisowy, (Docket No. 38), (hereafter "Pet.Appx.").[5]

The record shows that Petitioner was born on June 7, 1982.  He had a dysfunctional childhood, and by the time he was ten or eleven years old he was living in foster homes and juvenile detention centers.  (Pet.Appx., p. 208; Trans., p. 8.)  During his teenage years, he was involved in criminal activity that included theft, assault, robbery, tampering with motor vehicles, and selling drugs.  (Pet.Appx., p. 208; Trans., p. 7.)  He stopped attending school on a regular basis in 9th or 10th grade, and he dropped out of school altogether in 11th grade.  (Trans., p. 6.)

Petitioner also experienced depression and substance abuse as a teenager. (Trans., pp. 8-9.)  When Petitioner was seventeen years old he swallowed one-and-a-half bottles of Tylenol, because he felt "he had no reason to be on this earth."  (Pet.Appx., p. 208.)  Two months later he swallowed two bottles of Tylenol, because he had become "very depressed and did not want to live anymore."  (Id.; Trans., pp. 9-10.)  After Petitioner's second suicide attempt, he was admitted to the Willmar Regional Treatment Center in Willmar, Minnesota.  His mental health improved while he was there, but in January 2000 he assaulted two staff members, and he was then transferred to a detention center.

---

[5] This appendix has been filed under seal.

(Pet.Appx., pp. 209-10.)  Several months later, Petitioner was committed to a mental health care facility in Indiana.  (Trans., p. 11, Pet.Appx., pp. 217-18.)  At that time, he reportedly was suffering from "recurring auditory hallucinations and suicidal ideations."  (Pet.Appx., p. 218.)

Petitioner was released from the Indiana facility in June 2000, and he then returned to Minnesota.  (Id.)  In August 2000, Petitioner was arrested in Minneapolis on a charge of aggravated robbery.  (Id.)  He was held in the Hennepin County Jail, and while he was there, he was seen by a doctor who prescribed "antipsychotic medications, as well as medication for depression."  (Id.)  Petitioner was released from the Jail on December 6, 2000.  (Id.)  The murder for which Petitioner was convicted, and for which he is now serving a life sentence, was committed the next day – December 7, 2000.

Petitioner was arrested shortly after the murder, and he was thereafter detained at the Ramsey County Jail.  Petitioner was sentenced on May 10, 2001, and he was then transferred into the custody of the Minnesota Department of Corrections.  He began serving his life sentence at the Minnesota Correctional Facility in St. Cloud, Minnesota, ("MCF-SCL"), on May 11, 2001.

When Petitioner was at MCF-SCL, he was taking a psychiatric medication called Risperdal.  (Trans., p. 12.)  According to Petitioner, that medication "was working pretty good."  (Id.)  However, within a few months after arriving at MCF-SCL, Petitioner stopped taking his medication, and then assaulted a prison guard.  He was sent to a segregated confinement unit at MCF-SCL, pending a transfer to a more secure prison facility, the Minnesota Correctional Facility at Oak Park Heights, Minnesota, ("OPH").  (Id., p. 13.)  While Petitioner was still in segregated confinement at MCF-SCL, he attempted to commit

suicide by ingesting "a whole bunch of pills." (Id.) That incident expedited Petitioner's transfer to OPH. Upon his arrival there, in late 2001, he was housed and treated in the prison's mental health unit. (Id., pp. 13-14.)

Over the course of the next five-and-a-half years, (i.e., from the end of 2001 to the middle of 2007), Petitioner received regular attention and treatment for mental health problems identified as "serious depression" with "psychotic features." (Id., p. 15.) During that timeframe, by Petitioner's own count, he attempted suicide at least eleven more times: once in 2002, six times in 2003, twice in 2004, and twice in early 2007. (Petitioner's Memorandum in Support of Equitable Tolling, [Docket No. 21], p. 5.[6]) Most of Petitioner's suicide attempts occurred during the first eighteen months after he learned that his conviction and sentence had been affirmed by the Minnesota Supreme Court. According to Petitioner, his suicide attempts were precipitated by a sense of hopelessness he that felt when he contemplated his life sentence. (Trans., pp. 17-20.)

Because of Petitioner's repeated suicide threats and attempts, he was placed on "Continuing [or Constant] Observation Status," ("COS"), during much of his first few years of confinement at OPH. When Petitioner was on COS, he was carefully watched by prison officials to make sure that he did not try to harm himself.

> "An offender on COS status has no personal items in their possession while on COS. He is placed in a camera cell (for constant observation) and given a Kevlar gown and blanket. Staff can have contact with offenders ... on COS, and the offender can also have visits with people from the community, including legal visits, although with some restrictions in place, (ie., non-contact rooms)."

---

[6] Petitioner's Memorandum includes citations to Petitioner's prison records, which substantiate his various suicide attempts.

(Tammy Lisowy's answers to interrogatories, Pet.Appx., p. 240, § VI.F; <u>see</u> <u>also</u> Trans., p. 22.)

Petitioner was on COS for approximately 24 days in 2003, 33 days in 2004, 1 day in 2005, 0 days in 2006, and 27 days in 2007. (<u>Id</u>, p. 239, § VI.E.) Petitioner has not been on COS at any time since March 26, 2007. (<u>Id</u>.)

Petitioner's last COS placement in early 2007 coincided with his last suicide attempt. On February 5, 2007, Petitioner sliced his arms with a razor blade, and lost quite a bit of blood. (Pet.Appx., pp. 72-73; Trans., pp. 28-29.) Over the course of the next few weeks, Petitioner attempted to re-open his wounds, by biting on the sutures. (Pet.Appx., pp. 77-80; Trans., pp. 29-30.)

However, by March 22, 2007, Petitioner reported that his mood was "better," and, as recorded on his OPH Mental Health Unit "Progress Notes," he showed a "clear, organized thought process." (Pet.Appx., p. 84.) As noted above, Petitioner apparently was released from COS for the last time on March 26, 2007. The Progress Notes dated March 28, 2007, indicate that Petitioner was "calm, cooperative, engaged," and seemed to be "genuinely reflective." (<u>Id</u>., p. 86.) According to Progress Notes dated April 2, 2007, Petitioner said he was "fine," and he appeared to be "coherent and goal directed." (<u>Id</u>., p. 87.) At about this time, Petitioner decided that a change of scenery would be helpful, and he began working with prison officials on a plan to be transferred to the Minnesota Correctional Facility at Stillwater, Minnesota, ("MCF-STW"). (Trans., p. 30.)

A Progress Note dated August 1, 2007, indicates that Petitioner "does not appear to be depressed," there was "nothing suggesting psychosis," and "[h]is thinking is organized, he's oriented, memory intact." (Pet.Appx., p. 91.) A month later, (September

2007), Petitioner achieved his goal of being transferred to MCF-STW. Shortly after Petitioner arrived there, he underwent a psychiatric assessment. The examining physician reported that he was "neatly groomed," his "concentration and interest in things" were "fair," his mood was "subdued but very pleasant and cooperative," and "[h]is thought processes [were] logical and clear." (Id., p. 93.) Petitioner himself has reported that after he arrived at MCF-STW, he started a new medication regimen that stopped him "from being so depressed," "worked real good," and made him feel "like things were more even keel." (Trans., p. 31.) Indeed, Petitioner has described his new medication as "a miracle drug." (Id., p. 34.) Although he continued to suffer from depression, he "felt a little better," and was able to think about matters "outside the prison wall." (Id., p. 31.)

Petitioner's improved condition is confirmed by various psychiatric assessments that were prepared while he was at MCF-STW. Those reports show that Petitioner was no longer suicidal, and that he was thinking clearly and rationally. An assessment dated October 22, 2007, indicates that "[h]is thought processes are clear," (Pet.Appx., p. 94); an assessment dated December 3, 2007, indicates "[d]epressive symptoms are in remission," his "[a]ffect is appropriate," and he had "logical thought process," (id., p. 95); an assessment dated January 15, 2008, indicates that Petitioner's "[t]houghts are goal directed and logically based," (id., p. 96).

At some point during the first half of 2008, Petitioner got into a gang fight at MCF-STW, and he was then returned to OPH. (Trans., p. 31.) However, even when Petitioner was back at OPH, his mental health continued to be stable. A psychiatric assessment dated May 12, 2008, shows that although Petitioner was somewhat "subdued," he was "very rational and appropriate." (Pet.Appx., p. 97). Another assessment dated July 7, 2008,

shows that Petitioner "says he's getting along pretty well," and "seems very appropriate and rationale [sic]." (Id., p. 98.) As of September 26, 2008, Petitioner was working on a journal that included goals and "things he wants to address;" he was "calm, pleasant, polite, and cooperative;" he showed "[n]o signs of acute distress, depression, or other mental health problems;" he was "doing his segregation time [presumably the result of his gang fight at MCF-STW] constructively, utilizing it for self-reflection and personal growth;" and his "[t]houghts were logical and articulated clearly." (Resp.Appx., p. A-23.) A report dated December 3, 2008, describes Petitioner as being "mildly depressed, irratable [sic], and anxious," but notes that his "[t]houghts were clearly articulated." (Pet.Appx., p. 98A.) A note dated December 12, 2008, says that Petitioner was then having "some thoughts of suicide, but no intent." (Id., p. 99.)

The following month, January 2009, Petitioner completed and signed his current habeas corpus petition. The petition was filed with the Court on February 20, 2009. Since that time, Petitioner has continued to receive medication and therapy to treat his ongoing depression. (Pet.Appx., pp. 101; Trans., p. 34.)

## III. DISCUSSION

### A. The Statute of Limitations and the Doctrine of Equitable Tolling

28 U.S.C. § 2244(d) imposes a one-year statute of limitations on habeas corpus petitions filed by state prisoners. This statute provides as follows:

"**(d)(1)** A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

10

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

**(d)(2)** The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."

In this case, there is nothing in Petitioner's submissions which suggests that clauses (B), (C), or (D) of § 2244(d)(1) could be applicable. In other words, there is no suggestion that the State created any unconstitutional impediment that prevented Petitioner from seeking federal habeas relief within the prescribed one-year limitations period, and Petitioner has not shown that his current claims are based on any new, retroactively applicable, constitutional ruling, or any new and previously undiscoverable evidence that could extend the deadline for seeking federal habeas corpus relief.

Thus, the Court finds that the one-year limitations period began to run in this case, pursuant to § 2244(d)(1)(A), when Petitioner's judgment of conviction "became final by the conclusion of direct review or the expiration of the time for seeking such review." Petitioner's conviction and sentence were upheld by the Minnesota Supreme Court on direct appeal on January 30, 2003. However, for purposes of 28 U.S.C. § 2244(d)(1)(A), the judgment did not become "final" until the expiration of the deadline for filing a petition for a writ of certiorari with the United States Supreme Court. Smith v. Bowersox, 159 F.3d

345 (8th Cir. 1998) (state criminal convictions not final for statute of limitations purposes until the deadline for seeking certiorari has expired), cert. denied, 525 U.S. 1187 (1999). Certiorari petitions must be filed within 90 days after a final adjudication by a state's highest court. Sup. Ct. R. 13.1.

Therefore, for purposes of § 2244(d)(1)(A), Petitioner's judgment of conviction became "final" on April 30, 2003 -- 90 days after the Minnesota Supreme Court upheld his conviction and sentence on direct appeal. The statute of limitations expired one year later, on April 30, 2004. However, Petitioner did not file his current petition until February 2009, which was nearly five years after the statute of limitations had expired. Therefore, this action is clearly time-barred, unless it can be saved by the doctrine of equitable tolling.[7]

The United States Supreme Court has held that the § 2244(d) statute of limitations is subject to equitable tolling. Holland v. Florida, 130 S.Ct. 2549, 2562 (2010). However, a habeas corpus petitioner is eligible for equitable tolling "only if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." Id., quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005).

"'Equitable tolling is an exceedingly narrow window of relief.'" Finch v. Miller, 491 F.3d 424, 428 (8th Cir. 2007), quoting Maghee v. Ault, 410 F.3d 473, 476 (8th Cir. 2005). The Eighth Circuit Court of Appeals has made it very clear that equitable tolling is available

---

[7] The habeas corpus statute of limitations is tolled pursuant to § 2244(d)(2) when a prisoner files a state post-conviction motion, or otherwise seeks collateral relief, in a procedurally proper state court proceeding. However, the tolling provisions of § 2244(d)(2) cannot aid Petitioner here, because he has never applied for post-conviction relief in the state courts.

only "when extraordinary circumstances beyond a prisoner's control make it impossible to file a [habeas corpus] petition on time... [or] when conduct of the defendant has lulled the plaintiff into inaction." Jihad v. Hvass, 267 F.3d 803, 805 (8th Cir. 2001). "'[A]ny invocation of equity to relieve the strict application of a statute of limitations must be guarded and infrequent, lest circumstances of individualized hardship supplant the rules of clearly drafted statutes.'" Id. at 806, (quoting Harris v. Hutchinson, 209 F.3d 325, 330 (4th Cir. 2000)).

Equitable tolling cannot be based on such commonplace and non-external excuses as prisoner ignorance or inadequate legal assistance. Kreutzer v. Bowersox, 231 F.3d 460, 463 (8th Cir. 2000), cert. denied, 534 U.S. 863 (2001). Instead, the petitioner must show that some specific and truly extraordinary circumstances, of a wholly external nature, made it impossible for him to meet the statute of limitations deadline. The burden of proving the existence of such extraordinary circumstances rests with the prisoner. Pace, 544 U.S. at 418. See also Earl v. Fabian, 556 F.3d 717, 722 (8th Cir. 2009) (in habeas cases, "[t]he burden of demonstrating grounds warranting equitable tolling rests with the petitioner").

It is important to recognize that a prisoner is not automatically entitled to equitable tolling merely by satisfying the "extraordinary circumstances" requirement. He must also show that he has acted diligently in his pursuit of federal habeas corpus relief. Nelson v. Norris, 618 F.3d 886, 893 (8th Cir. 2010). See also Earl, 556 F.3d at 722 ("[w]e will decline to apply the doctrine of equitable tolling if a habeas petitioner has not diligently pursued his rights"). "The diligence required for equitable tolling purposes is 'reasonable diligence.'" Holland, 130 S.Ct. at 2565.

Generally speaking, federal courts have accepted the proposition that mental illness

can sometimes constitute an "extraordinary circumstance" that warrants equitable tolling.

Nichols v. Dormire, 11 Fed.Appx. 633, 634 (8th Cir. 2001) (per cruiam) (unpublished opinion) ("mental impairment can be an extraordinary circumstance interrupting the limitation period"); Riva v. Ficco, 615 F.3d 35, 40 (1st Cir. 2010) ("mental illness can constitute an extraordinary circumstance, which may prevent a habeas petitioner from understanding and acting upon his legal rights and thereby equitably toll the AEDPA limitations period"); Bolarinwa v. Williams, 593 F.3d 226, 232 (2nd Cir. 2010) ("[w]e see no reason why mental illness cannot [equitably] toll the AEDPA statute of limitations").

However, as the Court explained in Bolarinwa:

> "[M]ental illness does not toll a filing deadline per se; determining whether equitable tolling is warranted in a given situation is a 'highly case-specific inquiry.'... [Citation omitted.] The burden of demonstrating the appropriateness of equitable tolling for mental illness lies with the plaintiff; in order to carry this burden, she must offer a 'particularized description of how her condition adversely affected her capacity to function generally or in relationship to the pursuit of her rights.'... [Citation omitted.] Therefore, in order to justify tolling of the AEDPA one-year statute of limitations due to mental illness, a habeas petitioner must demonstrate that her particular disability constituted an 'extraordinary circumstance' severely impairing her ability to comply with the filing deadline, despite her diligent efforts to do so."

593 F.3d 232.

This Court has previously determined that:

> "[E]quitable tolling is warranted when petitioner sustains the burden of showing that mental illness during the limitations period actually made timely filing impossible because he either was substantially incapable of rational thought or unable to determine he must take legal steps."

Schleicher v. Fabian, Civil No. 07-4207 (DWF/AJB) (D.Minn. 2008), 2008 WL 4104702 at *6. Petitioner has cited the Schleicher standard in his memorandum in support of his petition, and appears to accept it as an accurate statement of the law. (Petitioner's

Memorandum In Support Of Equitable Tolling, [Docket No. 21], p. 9.)

Thus, the issue to resolved here is two-fold. First, has Petitioner adequately demonstrated that he suffered from a mental illness that made it impossible for him to seek federal habeas corpus relief in a timely manner? Second, has Petitioner adequately demonstrated he pursued federal habeas corpus relief with suitable diligence?

B. <u>Application of Equitable Tolling</u>

The record in this case clearly shows that Petitioner has suffered from mental illness for virtually his entire adult life. Moreover, it appears that during certain finite periods of time, Petitioner's mental condition may have made it impossible for him to prepare and file a habeas corpus petition. Most notably, Petitioner was not able to seek habeas corpus relief during much of the time immediately after his various suicide threats and attempts, because he often was on COS following those episodes. While Petitioner was on COS, he did not have access to the basic tools and materials needed to file a habeas corpus petition – namely, a writing instrument and paper. There might have been other periods of time when Petitioner was not on COS, but it still was impossible for him to seek federal habeas corpus relief, because his mental illness prevented him from thinking and acting rationally.

However, it is readily apparent that Petitioner's mental illness has not always made it impossible for him to file a habeas corpus petition. The record shows that he still was suffering from mental illness right before he filed his petition, (Pet.Appx., pp. 98A-100), and he has continued to suffer from mental illness after he filed his petition, (<u>id</u>., p. 101; Trans., p. 34). It is therefore evident that at some time during Petitioner's imprisonment, he became capable of preparing and filing a habeas corpus petition, despite his ongoing

15

mental illness.  The real question, then, is this: When did it become possible for Petitioner to prepare a habeas petition, despite his mental illness, and did he thereafter proceed with adequate diligence?

The record clearly shows that Petitioner's mental health took a dramatic turn for the better very soon after his last suicide attempt on February 5, 2007.  Just a couple weeks later, he told his therapist that he wanted to get out of COS, so that he could work on a new "appeal."[8]  By March 2007, Petitioner was out of COS for the last time, and he was then able to resume working on his challenge to his conviction.  The record shows that after March 2007, Petitioner's mental health began to stabilize, with no significant setbacks.

The notes and reports in the record consistently show that at virtually all times after March 2007, Petitioner was able to think clearly and rationally.  A report dated March 19, 2007, says that "[h]is mind clearly seems coherent," (Pet.Appx., p. 80); a report dated March 22, 2007, mentions his "[c]lear, organized thought process," (id., p. 84); a report dated March 28, 2007, describes Petitioner as "[c]alm, cooperative, engaged [and] genuinely reflective," (id., p. 86); a report dated April 2, 2007, states that he is "[c]oherent and goal directed," (id., p. 87); a report dated June 8, 2007, similarly states "thought processes goal directed," (id., p. 90); a report dated August 1, 2007, says that "[h]is thinking is organized," and his "memory [is] intact," (id., p. 91); a report dated August 20, 2007, says that Petitioner's "thoughts were logical and clearly presented," (id., p. 92).

---

[8]  A report dated February 20, 2007, indicates that Petitioner told his therapist, Tammy Lisowy, that "he is 'getting really mad' that he is not getting off of COS yet, and added, 'I have stuff you're keeping me from doing,' referencing his work on his appeal." (Pet.Appx., p. 78.)  By then, of course, Petitioner's direct appeal had been fully completed, so he must have been referring to some post-conviction proceeding – presumably a federal habeas corpus petition.

In September 2007, Petitioner accomplished his goal of being transferred to a different prison, and after he arrived at MCF-STW, his clear and rational thinking continued. An initial report from MCF-STW indicates that Petitioner's "thought processes are logical and clear," (id., p. 93); a month later, the report was the same – "[h]is thought processes are clear," (id., p. 94); another report from December 2007 again mentions "logical thought process," (id., p. 95); in January 2008, Petitioner's "[t]houghts [were] goal directed and logically based," (id., p. 96).

By May 2008, Petitioner had returned to OPH, because he violated disciplinary rules by getting into a fight at MCF-STW. Although he was undoubtedly disappointed and depressed about being back at OPH, he still was found to be "very rational and appropriate." (Id., p. 97.) In July 2008, he still "seem[ed] very appropriate and rationale [sic]." (Id., p. 98.) In December 2008, Petitioner's "[t]houghts were clearly articulated." (Id., p. 98A.)

The reports that were prepared between February 2007 and February 2009 do not suggest (by any means) that Petitioner had fully recovered from all of his mental health problems, and was functioning as a content, well-adjusted, prisoner. To the contrary, the record shows that Petitioner continually suffered from depression at all times after February 2007. However, the record also shows that after Petitioner attempted suicide for the last time in February 2007, and after he was released from COS for the last time, in March 2007, his thinking and his reasoning were not impaired in any meaningful way. In other words, the record shows that even though Petitioner was mentally ill, he could still think clearly, logically and rationally.

Based on the evidence submitted by the parties, the Court finds that Petitioner has

suffered from significant mental illness, (predominantly depression), for many years. For some period of time, that illness might have impaired his ability to seek federal habeas corpus review of his state criminal conviction. However, if Petitioner's mental illness ever made it impossible for him to pursue federal habeas corpus relief,[9] that ceased to be the case by about March or April 2007. Since at least that time, Petitioner's thought processes have been clear and rational, and he has had the mental capacity to prepare and file a habeas corpus petition. This determination is fortified by Petitioner's own subjective assessment of his mental health. In a handwritten affidavit, Petitioner candidly

---

[9] There is substantial evidence in the record which suggests that Petitioner's mental illness never prevented him from preparing and filing a timely habeas corpus petition. Even before 2007, Petitioner was able to earn a GED, (Trans., pp. 24, 38), and he was able to perform various prison jobs, and complete various classes, (Trans., pp. 35-39). Petitioner's primary therapist, Tammy Lisowy, has stated that during the period of April 30, 2003, to February 20, 2009, Petitioner's mental illness did not deprive him of the ability to think rationally and take actions to benefit himself. Referring to that period of time, Ms. Lisowy has stated that:

> "I am not of the opinion that Mr. Waddell lacked the capability for rational thought for any time during the period in question. Although he struggled with Major Depression and Borderline Personality Disorder which led to acts of significant self-injury, he was still capable of rational thought, picking up a phone to make a phone call, expressing his thoughts, wants, and needs, writing letters, etc. Often times after an incident of self-injury, within a day or a few days, he was wanting to get back to his previous activities/programming."

> "[H]e was able to appreciate his situation and was able to determine that he must take legal steps during his incarceration."

> "Although Mr. Waddell has struggled with Major Depressive Disorder and Borderline Personality Disorder, he also has shown the ability to think rationally and communicate clearly, develop skills to take care of himself and manage his mental health, as well as work toward goals and make positive, constructive changes within and for himself."

(Pet.Appx., pp. 240-41.)

acknowledges the "late filing" of his petition, and states that: "4. My excuse is due to my mental illness. 5. Which took place between the years 2000-2007." (Pet.Appx., p. 1.) In another affidavit, dated January 9, 2009, Petitioner seeks to excuse the tardiness of his current petition, because, as he puts it, "[b]etween the years 2002-2007, I Raymond Maurice Waddell has had a mental illness." (Pet. 1st Aff., ¶ 2.) These affidavits show that Petitioner himself believes his mental illness was no longer a filing impediment, beginning sometime in 2007. (See also Trans., p. 35, (Petitioner confirms the dates of his mental illness as "between 2002 and 2007").)

In sum, Petitioner has not shown that he was any less capable of filing a habeas petition in March or April of 2007 than he was in February 2009, when he finally did file his petition. If Petitioner's mental illness was ever an impediment that made it impossible to file a habeas corpus petition, that impediment ended more than one year, and probably closer to two years, before Petitioner filed his petition.

The Court must next consider whether Petitioner acted diligently after his filing impediment ended. The resolution of that issue is self-evident: He did not.

Equitable tolling is, by definition, an equitable remedy, and as such, it is subject to the ancient equitable principle of laches. This means that a litigant who invokes equitable tolling must demonstrate that he has not "slept on his rights." See Sullivan v. Portland & K.R. Co., 94 U.S. 806, 811-12 (1876) ("[a] court of equity... , has always refused its aid to stale demands where a party has slept upon his rights"; "[l]aches and neglect are always discountenanced"). "Under long-established principles, [a] petitioner's lack of diligence precludes equity's operation." Pace, 544 U.S. at 419.

Here, by Petitioner's own reckoning, the impairment that arguably prevented him

from filing a timely habeas corpus petition had dissipated by sometime in 2007. Yet Petitioner did not file his current petition until 2009. It is therefore obvious that Petitioner did not act diligently after his impediment subsided. See Nelson, 618 F.3d at 893 (habeas petitioner "failed to pursue his rights diligently," because he did not file his habeas petition until nine months after the cessation of the apposite filing impediment); Earl, 556 F.3d at 724 (equitable tolling not available where petitioner did not file his petition during an eight-month window of opportunity); Pace, 544 U.S. at 419 (petitioner did not act with requisite diligence when he "[sat] on his rights" for five months). Compare, Holland, 130 S.Ct. at 2565 (petitioner acted diligently when he prepared his petition "the very day" the filing impediment ended, and thereafter "promptly filed it") (emphasis in the original).

Petitioner has suggested that the primary reason he did not file his habeas petition until 2009 is that he simply "didn't know anything about it," (Trans., p. 32), until "[i]t was pointed out to [him] that [he] should start" working on it, (id., p. 33). In one of Petitioner's affidavits, he reiterates that "I've recently found out I can file A Writ of Habeas Corpus in Federal Court." (Pet. 1st Aff., ¶ 7.) However, "[p]risoners are not exempt from the principle that everyone is presumed to know the law and is subject to the law whether or not he is actually aware of the particular law of which he has run afoul." Baker v. Norris, 321 F.3d 769, 772 (8th Cir.), cert. denied, 539 U.S. 918 (2003). Therefore, Petitioner's lack of knowledge of the law cannot excuse his lack of diligence. Earl, 556 F.3d at 724 (""[e]ven in the case of an unrepresented prisoner alleging a lack of legal knowledge or legal resources, equitable tolling has not been warranted"") (quoting Kreutzer, 231 F.3d at 463).


Sometime in 2007, (at the latest), Petitioner's mental illness ceased to be an

obstacle that made it impossible for him to file a habeas corpus petition. But he waited until 2009 – more than a full year – before he actually filed his petition. Aside from a lack of legal knowledge and experience, (which is not an adequate excuse), Petitioner has offered no explanation for that lengthy delay. Waiting more than a year – and probably closer to at least two years – is not reasonable diligence.

## IV. CONCLUSION

Under the one-year statute of limitations prescribed by 28 U.S.C. § 2244(d)(1), Petitioner was required to file his federal habeas corpus petition by April 30, 2004. However, the current petition was not filed until February 2009. Therefore, this action is clearly time-barred, unless Petitioner's lateness could be excused by applying the doctrine of equitable tolling. Equitable tolling would be permissible only if Petitioner showed that (a) he was prevented from filing his petition in a timely manner because of "extraordinary circumstances" that were beyond his control, and (b) he diligently proceeded to file his petition as soon as possible.

The Court has accepted Petitioner's contention that his mental illness should be viewed as an "extraordinary circumstance" that prevented him from filing his petition before the statute of limitations expired. However, Petitioner himself has indicated that his mental illness ceased to be a disabling impediment sometime in 2007. The evidentiary record confirms that Petitioner's mental health took a significant turn for the better after his last suicide attempt in February 2007. Beginning in March 2007, all of the psychiatric notes and reports show that even though Petitioner continued to suffer from depression, he was able to think clearly and rationally. Nothing suggests that he was delusional, or otherwise incapacitated, and he never spent any more time in COS. Nothing suggests that

Petitioner's mental illness made it impossible to file a habeas corpus petition at any time after March 2007.

Nevertheless, Petitioner waited for almost another two years before he finally filed his current petition. That delay is not excusable. Because Petitioner did not act with reasonable diligence, he is not eligible for equitable tolling. The Court therefore recommends that this action be summarily dismissed, with prejudice, due to untimeliness.

## V. CERTIFICATE OF APPEALABILITY

A § 2254 habeas corpus petitioner cannot appeal an adverse ruling on his petition unless he is granted a Certificate of Appealability, ("COA"). 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA cannot be granted, unless the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). To make such a showing, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. Daniel, 529 U.S. 473, 484 (2000).

In this case, the Court recommends that Petitioner should be granted a COA for the following interrelated issues:

"Under what circumstances can the § 2244(d)(1) statute of limitations be equitably tolled by reason of a prisoner's mental illness, and has Petitioner adequately demonstrated that such circumstances existed in this case?"

## VI. RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1. Petitioner's petition for habeas corpus relief under 28 U.S.C. § 2254, (Docket No.

1), be **DENIED**;

    2.  This action be **DISMISSED WITH PREJUDICE**; and

    3.  Petitioner should be granted a Certificate of Appealability for the following issues:

"Under what circumstances can the § 2244(d)(1) statute of limitations be equitably tolled by reason of a prisoner's mental illness, and has Petitioner adequately demonstrated that such circumstances existed in this case?"

Dated: November 30, 2010

                                      s/ Arthur J. Boylan
                                      ARTHUR J. BOYLAN
                                      Chief United States Magistrate Judge

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before December 14, 2010.